v. Murray. Hear ye, hear ye. This Honorable appellate court for the second district is now open. Justice Joseph E Burkett along with Justice and Jorgensen and Justice Liam see Brennan. The case is number two, 170933 people of the state of Illinois plaintiff appellate versus Joseph Murray defendant appellant arguing for the appellant. Amber Hopkins read arguing for the appellee. Mary Beth Burns. Both parties ready to proceed. The defense is your honor. The people are your honor. Just another reminder are not speaking. Please mute your phone. All right. This happens. Read. You may proceed. Good morning, your honors and may it please the court counsel. My name is Amber Hopkins read and I'm with the office of the state appellate defender here on behalf of the defendant appellant Joseph Murray. Under both the legal procedure and facts of this case, Murray has made a sufficient showing during a third stage evidentiary hearing that his trial counsel's performance was deficient when he failed to impeach the only eyewitness with three lineups that were performed after Curtis pride's death. However, the circuit court improperly determined that Murray was not prejudiced by counsel's deficient performance. Accordingly, this case becomes comes before the court on the very narrow issue of prejudice. This court should find that Murray made a sufficient showing of prejudice to show that his trial counsel was ineffective. Thus, this court should reverse Murray's conviction and remain the matter for a new trial. So, looking first at the posture and legal standards involved in Murray's case here, the state filed a motion to dismiss at the second stage, which argued that Murray's claim should not advance onto the third stage because the evidence of the defendant's guilt in this case was and is overwhelming and would not have been diluted or mitigated by different decisions of counsel. However, it is well established that the court has the authority to rely on either prong of the Strickland analysis to dismiss a Strickland claim. The circuit court made a decision not to dismiss Murray's claim on the purely legal ground of harmlessness at the second stage, although it could have. As such, the court indicated that it believed that Murray made a substantial showing of a constitutional violation regarding both Strickland prongs. Further, the legal standards applicable at the second and third stage regarding pure questions of law do not change. The question is still whether there was a substantial showing of a constitutional violation. The only difference between these stages is whether the facts and credibility determinations are liberally construed in favor of the defendant, which, again, is irrelevant in a question, a pure legal question, which, coincidentally, the second prong of the Strickland prejudice analysis is a purely legal determination, which the circuit court found was met at the second stage standard, which was, as I said, the same as the third stage standard. That means that it met a significant constitutional violation. However, at the third stage hearing, the court made factual and credibility determinations on whether counsel performed efficiently, but then doubled back on its legal finding of prejudice without indicating what had changed between the court's finding in favor of prejudice at the second stage and its later change of heart. Accordingly, this arbitrary determination should weigh in favor of Murray's request for a new trial. Next, looking at the totality of the evidence presented at trial and the repeated claims of ineffective assistance of counsel against defense counsel, Murray showed by a preponderance of the evidence that his chance at a different outcome was better than negligible. Looking first at the DNA in the presence of a winter hat at the scene. Here, Kedre, the eyewitness, stated that the hat found at the scene was similar to one worn by the shooter. Wade and Bettis also said that the hat found looked like one that Murray owned. However, just because Murray has been seen wearing a similar hat and his DNA was on this hat does not mean that he was the shooter. Kedre's own account supports that Murray couldn't have been the shooter as Kedre saw the shooter fleeing from the apartment basement with the hat still on his head. This would make the hat found and the DNA extracted later irrelevant to the murder. Overall, the presence of the hat alone does not indicate that it was left by the shooter. Looking next to Bettis' failure to appear. Contrary to the trial court's findings, Bettis' recanting was not due to any call made between Murray and Bettis. You can see this based on the record. Bettis had her police interviews on January 7, 2010. Five days later, she reached out to a private investigator regarding the statements she made in this case, suggesting that Bettis wanted to recant her statements as early as five days after she made them, well before any call was made in this case during trial. Thus, the trial court's determination that the recantations were not effective due to its incorrect perception that Murray had an influence over Bettis' testimony is against the manifest weight of the evidence. Further, despite the call with Murray, Bettis showed up to court and explained her absence to the court. There, she indicated that the state's attorney was disrespectful and rude to her and she just couldn't take it any longer. Accordingly, the fact that there was a call between Murray and Bettis before Bettis testified should not be given significant weight to determine if there is a reasonable probability of a different outcome at trial, especially since Bettis recanted her testimony prior to any call. Next, what is essentially the focal point of the evidence? I will cover Bettis' and Kidre's testimony. Here, the evidence is essentially a contest between Bettis and Kidre, especially considering that the DNA is relevant based on which party is considered more credible. But as the trial court noted here, Kidre was innocent, truthful, and credible. So looking first at Bettis' testimony, her testimony should be given limited weight because throughout the investigation and trial, she has given multiple inconsistent statements to police. Her testimony has ranged from being asleep during the shooting, to driving the defendant to the shooting, to not being able to remember anything, to stating that the defendant didn't wear the clothes identified by Kidre on the day of the shooting. At every turn, her testimony has been inconsistent. However, to her credit, as I mentioned earlier, after she gave her testimony to the police on January 7th, she reached out almost immediately to a private investigator to recant her testimony, which indicates that she was going to recant her testimony about what she gave to the police prior to trial. Next, looking at Kidre's testimony and the lineups. So here, the lineups clearly undermine Kidre's identification of Murray at trial. The impeachment value of the directly contradictory testimony made by the state's premier eyewitness can hardly be overestimated. And case law supports that a witness identification regarding a description and ID made closer in time to the offense is the one most credible. Here, Kidre's description made closest in time to the event was that the defendant or the perpetrator was skinny or medium build, 150 pounds, in his mid-20s, and about 5'8 tall. He also selected two men that the perpetrator looked like in lineups. Those two men were Adarius Walton and Vincent Kanzler. And other similarities you can see from these two photos that Kidre said looked like the perpetrator is that they had close-cut hair and narrow jawlines. The defendant's description, however, he was 32 years old at the time of the offense, 5'11", 220 pounds, had braided hair, and a round face and jaw. To not bring these lineups before the jury and impeach Kidre's first identification of Murray as the perpetrator operated to give Kidre significantly more credibility than he deserved. Additionally, looking at Kidre's description of the clothing that the shooter wore, there were also significant discrepancies compared to what Murray was wearing in the picture that was taken of him at the hospital. Kidre's description was that the perpetrator was wearing a red winter coat or jacket, not a sweatshirt, with white writing across the chest, but not the sleeves, and had buttons. He was also wearing blue jeans and white shoes. The picture of Murray, however, showed him in a hooded sweatshirt with gold and white lettering across the chest. The sleeves were red and not white, but did have some writing on them, and it was a sweatshirt with a zipper and not buttons. This discrepancy would likely have been seen as more significant had the jury known that there was a justifiable reason to doubt the veracity of Kidre's testimony. Overall, Kidre was the only witness to have seen the shooter immediately before and after his father was shot, and his identification of Murray as the perpetrator is completely undermined by the lineup evidence, and the remainder of the evidence doesn't directly point to Murray as the shooter. In conclusion, just because there was a prior decision finding no prejudice doesn't mean that prejudice can't be found in this instance, especially here where counsel's representation was so poor. There were multiple claims of ineffective assistance of counsel, with even the direct appeal being decided based on Strickland prejudice, and counsel admittedly chose to consider Kidre's interests over the interests of his own client. These factors, in conjunction with those discussed above, continue to chip away at any appearance of harmlessness. Thus, this court should find... Your Honors, may I finish for the release? Yes, go ahead. This court should find that Murray was prejudiced by counsel's deficient performance and reverse Murray's conviction and remand the matter for a new trial. Thank you. Justice Jorgenson, your questions. You have talked about all these issues of prejudice, but don't we weigh that against all of the evidence in the case? Yes, this court should look at all the evidence in the case. All right. What about the hat? Isn't that pretty compelling evidence? Well, the hat, as I stated, is compelling based on whose testimony is more credible. Kidre... Right. He was the one who said he thought that the shooter or the perpetrator left with the hat. Correct. Correct? Yes, correct. However, do we just ignore the way this hat just simply appeared in the common area right outside the door? How do we balance that? The hat could have been placed there in any number of instances that are irrelevant. But how does that hat with his DNA get there? When we had a witness, a completely unbiased witness, who said it wasn't there when I left, it was there when I got back. I can't remember the name of the neighbor who said it wasn't there when they had left the apartment earlier. Right. But, again, the hat could get there in any number of ways. As was even discussed at the post-conviction proceedings, the defendant had been known to use marijuana. He also, his girlfriend or ex-girlfriend at the time lived nearby. So there's any number of ways the hat could have gotten there prior to the shooting that doesn't connect him to the scene or to the actual shooting. Okay. That was my question. Justice Burkett, I have no further questions. Thank you, Justice Jorgenson. Justice Brennan. Justice Brennan, you're on mute. Sorry about that. My question is about Bettis. Even though her various accounts are across the board, for lack of a better way to phrase it, the jury, couldn't they reasonably conclude that the detail in terms of her driving him there, seeing the outline of the gun in the pants, and having him go out of the car with a hat, back to the car without a hat? I mean, even though she's all over the board, isn't the jury within its rights to, if they like, pick that particular version, especially when it dovetails so well with the other physical evidence, especially the hat that Justice Jorgenson just referred to? Of course, the jury, it's well within its right to weigh the credibility of each witness, but the jury also wasn't given the additional evidence that the lineups completely contradict the only person who saw the actual perpetrator of the shooting. So, when taking all of this evidence together and you see that Bettis' testimony goes one way and then the other, Kedre is the only consistently truthful and credible witness, and his description of the defendant is the complete opposite of what the defendant actually is. And the jury wasn't able to weigh that testimony, and if that evidence were to go before a jury, there's a reasonable likelihood of a different outcome in this case. All right. Thank you. No other questions. Thank you, Justice Brennan. In your brief, you cite the federal case for the proposition that the showing has to be more than negligible for prejudice to be found. But isn't the standard in Illinois that in order for us to find prejudice to deficient performance, you must show that the trial was unreliable or that his performance was so ineffective that it rendered the result of the trial unreliable? Isn't that the standard in Illinois? A reasonable probability of a different outcome, correct. So, it's not just showing, you know, it's not just speculation. You've got to actually make a showing that there is a reasonable probability of a different outcome such that we believe, the reviewing court believes, the result of the trial is unreliable. Now here, as the trial court found, both Judge Bridges and Judge Strickland both found that the evidence was overwhelming even without the impeachment, correct? Well, the trial, the third stage hearing judge relied primarily on the appellate court's decision. And the appellate court didn't consider the Keidre's identification of the defendant because at the first direct appeal, Keidre's identification of the defendant wasn't at issue. Now, this new evidence has come up, which completely contradicts the evidence that was initially relied on and requires a new balance of the evidence. And this impeachment evidence of the only credible witness makes it such that the probability of a different outcome is likely because he's the only credible witness that the state had. Well, you know, credibility determinations are up to the jury. And here, not only do you have that evidence, obviously the inconsistencies in identification is something that was before the jury. The jury knew what the description was and they looked at the defendant so they had that opportunity to weigh that testimony. But wasn't the phone call to Bettis the evening of February 28th devastating to the defense? Telling a witness not to show up is devastating testimony, is it not? It definitely was something that the jury could weigh. However, as I indicated, Bettis, the record shows that Bettis was interested in recanting her statement almost immediately after she made it. So it shouldn't weigh significantly against Murray and the weight of the evidence here because she indicated that she was drunk and high at the time that she gave the statement and she didn't remember it then. Our review was de novo because it was a different judge and the evidence is in the record. But the trial court at the third stage hearing cited the DNA, Bettis' testimony, the damaging phone calls, and found that the evidence was overwhelming. Where is the trial court wrong in viewing that evidence in the light of all the other evidence, including the DNA, that the result of the trial would not have been different? The trial court went wrong because it didn't give the impeachment evidence the significant weight that it deserved. When looking at the entirety of the evidence and how the court looks at and weighs basically Bettis' testimony against Kidre's, the court even found that Kidre's testimony is more credible. Ergo, Kidre's belief that the perpetrator left with the hat shows that the DNA left at the scene is not relevant. And the impeachment evidence that completely contradicts who the perpetrator of the shooting was should be given significantly more weight. If the jury had seen that evidence, the jury would have likely considered it significant and given Kidre much less – they would have found him much less credible than he actually was. And it could have not only impacted what he said the defendant looked like, it also would have impacted Kidre's description of the clothing, which implicates other photos that were introduced in the case. Okay, very well. That's all I have. Ms. Burns for the state. Good morning, Your Honors. My name is Mary Beth Burns, and I represent the people of the state of Illinois. We come before this court this morning to respectfully ask you to affirm the trial court's judgment denying the defendant post-conviction relief. As an introductory point, I would like to comment on one of counsel's arguments that trial counsel considered the young witness's interests over his client's. I think even the post-conviction court's decision in finding that counsel was unreasonable in not impeaching was not based on giving the witness's interests more concern. What the trial court properly found was that trial counsel's concern was that the jury would react negatively to his client if he impeached or overly challenged the victim's young son. It wasn't for the benefit of the young son. It was for the benefit of his client. Even so, the trial court determined that the defendant had met the first performance prong. However, I think that the trial court's determination that he did not meet the prejudice prong is really compelling. The post-conviction court looked at the issue of the impeachment within the context of all of the evidence, and it did, in fact, seriously consider the DNA in the hat, the woman who was the other end of the romantic entanglement, which apparently was the motive for the shooting, and she recognized the hat as well. And so the hat with the defendant's DNA at the scene is very compelling. Jovan Pettis's multiple statements, despite her recantation, what she told the police, despite the fact that she claimed to have been high, was so consistent with what actually occurred that day that I think the jury was entitled to reject her recantation. And this court, on direct appeal, found overwhelming evidence, even not considering her testimony. So I think, realistically, the post-conviction court properly found that the defendant had not met the prejudice prong. I understand that this court has read the briefs, and so I'd be willing to listen to your questions. Justice Jorgensen. Well, how do we ignore the totality of defendants' arguments that the jury, bottom line, didn't have all the impeachment in front of it and, therefore, did not make a proper credibility determination? I think, realistically, in the same way that, on direct appeal, this court did not consider Ms. Pettis's testimony, the post-conviction court considered the evidence independent of the impeachment in finding overwhelming evidence. So I think that the post-conviction court properly parsed out the evidence when it made its determination, and it found that the surrounding evidence independent of the impeachment was sufficiently overwhelming that it would not have – there would not have been a reasonable probability of a different result. All right. That was really my question. Justice Brennan. I do not have any follow-up questions. Thank you. Ms. Burns, the trial court – I'm talking about the trial, not the post-conviction judge – talked about the devastating – I think apparently referring to the tape of Pettis's statements to the police, and he referred to forfeiture by wrongdoing. Is that what the court allowed that tape in as – under the forfeiture by wrongdoing doctrine at trial? I'm talking about the defendant's statements to Pettis. Right. And the trial – I will be honest. I do not recall how it came about at trial. I think that – But it came in as substantive evidence. Yes. It was substantive evidence of what the defendant said and did on that date, and then you also had the phone call from February 28th where the defendant is telling Pettis not to come to court, correct? Yes. And it's your position that that testimony would have overwhelmed any inconsistencies with the eyewitness testimony, correct? Yes. That's all I have. Thank you. Ms. Hopkins, read rebuttal. Thank you, Your Honor. I just have two quick points in rebuttal, and I'll turn it over for questions after that. I just want to quickly make note that any issue that the state has with the first prong of Strickland is forfeited because it wasn't raised in the brief, and in any case, they did not make a showing that the trial court's decision was manifestly erroneous on that issue. Next, I want to point out that the state consistently cites that the evidence was – the trial court's decision was independent of impeachment, but the third stage hearing needs to consider the impeachment evidence in addition to the weight of the other evidence to determine if the evidence as a whole, if there's a reasonable probability of a different outcome. So, those are the only two points I would like to make. If Your Honors have any questions. Any questions? No follow-up. Thank you. Justice Brennan, any questions? Justice Brennan? I have no follow-up either. Thank you. Just briefly, Ms. Hopkins-Reed. In your brief, you – at page – – United States v. Hampton – Exerell Hampton v. Leibach, a 2003 Seventh Circuit case for the proposition that all the defendant needs to show that a chance of a different outcome was better than negligible. Do you have an Illinois case that makes that statement better than negligible? Not yet, Your Honor. All right. Thank you. That's all I have. Thank you. The court – Thank you, Your Honors. The court thanks both parties for your arguments this morning. The case will be taken under advisement. A written decision will be – The court stands adjourned. Justice Jorgensen, you'll initiate the call? I will. Thank you. Thank you.